**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **LAWRENCE DIKE,** | § | |
| **PLAINTIFF** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **COLUMBIA HOSPITAL CORPORATION OF** | § | **CIVIL ACTION NO. 2:21-cv-00308** |
| **BAY AREA, INDIVIDUALLY AND D/B/A** | § | |
| **CORPUS CHRISTI MEDICAL CENTER;** | § | |
| **BAY AREA HEALTHCARE GROUP, LTD.,** | § | |
| **INDIVIDUALLY AND D/B/A CORPUS** | § | |
| **CHRISTI MEDICAL CENTER; AND HCA** | § | |
| **HEALTHCARE, INC.,** | § | **JURY DEMAND** |
| **DEFENDANTS** | § | |

**PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT**

**I.  JURISDICTION AND VENUE**

1.      This is a civil action against Defendants, Columbia Hospital Corporation of Bay Area,

Individually and d/b/a Corpus Christi Medical Center; Bay Area Healthcare Group, Ltd.,

Individually and d/b/a Corpus Christi Medical Center; and HCA Healthcare, Inc., for damages in

violation of rights guaranteed to Plaintiff under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §2000e, et seq. in accordance with its provisions against race, color, and

national origin discrimination and retaliation. More specifically, this action seeks monetary

damages, including mental anguish, and all other appropriate relief to which Plaintiff is entitled

under the law on account of race, color, and national origin discrimination and retaliation.

2.      This is also a civil action against Defendants, Columbia Hospital Corporation of Bay Area,

Individually and d/b/a Corpus Christi Medical Center; Bay Area Healthcare Group, Ltd.,

Individually and d/b/a Corpus Christi Medical Center; and HCA Healthcare, Inc., for damages in

violation of rights guaranteed to Plaintiff under 42 U.S.C. §1981, as amended by the Civil Rights

Act of 1991, §1981a regarding the right to make and enforce contracts and full and equal benefits

under the statute. More specifically, this action seeks monetary damages, including mental anguish, and all other appropriate relief to which Plaintiff is entitled under the law on account of race, color, and national origin discrimination, hostile work environment, and retaliation.

3.      The jurisdiction of this Court is invoked pursuant to 42 U.S.C. §2000e-5(f)(3), 42 U.S.C. §1981, as amended, 28 U.S.C. §1343(a), 28 U.S.C. §1331 and venue is proper pursuant to 28 U.S.C. §1391(b) for acts committed within this judicial district.

## II. <u>PARTIES</u>

4.      Lawrence Dike, (hereinafter Plaintiff), a Black African male and former employee, was an individual employed by an employer as contemplated by Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §2000e(a). Plaintiff was a resident of Corpus Christi, Nueces County, Texas at the time of the incident.  Plaintiff is a citizen of the United States and at all times relevant to this complaint was a resident of this division.

5.      Defendant, Columbia Hospital Corporation of Bay Area, Individually and d/b/a Corpus Christi Medical Center (hereinafter Medical Center, CCMC, or Defendant), is a corporation organized and registered to do business under the laws of the state of Texas and doing business in Nueces County, Texas and is an employer as contemplated under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §2000e(b). This entity is identified as Plaintiff's employer on his pay stub issued to him because of the employment made the basis of this lawsuit and this entity is being sued as Plaintiff's employer in this lawsuit. Service of process may be served on counsel for Defendant Nancy Patterson as provided in the Federal Rules of Civil Procedure. This Defendant is an independent legal entity, and it is an affiliate under the corporate umbrella of HCA Healthcare, Inc. a publicly traded entity which owns and operates over 180 hospitals at multiple sites, including surgery and urgent care centers, in multiple states and internationally.

2

6.     Defendant, Bay Area Healthcare Group, Ltd., Individually and d/b/a Corpus Christi Medical Center, (hereinafter Medical Center, CCMC, or Defendant), is a domestic limited partnership registered to do business under the laws of the state of Texas and doing business in Nueces County, Texas and is an employer as contemplated under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §2000e(b). It has two general partners, Columbia Hospital Corporation of Bay Area and South Texas Surgicare, Inc. This Defendant is Plaintiff's employer and/or joint employer and it owns and operates hospital facilities located at Corpus Christi Medical Center Doctors Regional, 3315 Alameda, Corpus Christi, Texas; Corpus Christi Medical Center – The Heart Hospital, 700 Williams Dr., Corpus Christi, Texas 78412; Corpus Christi Medical Center Bay Area, 7101 South Padre Island Drive, Corpus Christi, Texas 78412; Corpus Christi Medical Center – Bayview, 6629 Wooldridge Road, Corpus Christi, Texas 78414 and Corpus Christi, Medical Center – Cancer Center, 1625 Rodd Field Road, Suite 200, Corpus Christi, Texas 78412; ER 24/7 Northwest located at 13725 Northwest Blvd., Corpus Christi, Texas 78410; ER 24/7 Portland located at 1702 Highway 181 North, Suite A-11, Portland, Texas 78374; and ER 24/7 Rockport located at 400 Enterprise Blvd., Rockport, Texas 78382. Service of process may be served on counsel for Defendant Nancy Patterson as provided in the Federal Rules of Civil Procedure.

7.     Defendant, HCA Healthcare, Inc. ("HCA"), is a business incorporated under the laws of the state of Delaware and doing business in Nueces County, Texas. This Defendant is Plaintiff's joint employer and/or it was an integrated enterprise with Columbia Hospital Corporation of Bay Area, individually and d/b/a Corpus Christi Medical Center, at all times made the basis of this lawsuit and is an employer as contemplated under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §2000e(b). This Defendant may be served on counsel for Defendant Nancy Patterson as provided in the Federal Rules of Civil Procedure. This Defendant may alternatively be served by waiver pursuant to the Federal Rules of Civil Procedure.

3

### III.  ADMINISTRATIVE PROCESS

8.      On or about December 22, 2017, Plaintiff filed his initial written charge of discrimination on the basis of race, color, national origin and retaliation against Corpus Christi Medical Center HCA Affiliate with the U.S. Equal Employment Opportunity Commission (EEOC), which was amended on or about April 27, 2018.

9.      Subsequently, the U.S. Equal Employment Opportunity Commission issued and sent a Dismissal and Notice of Rights, dated September 30, 2021, to Plaintiff, which he subsequently received.

10.     Plaintiff has exhausted his administrative remedies with EEOC and has timely filed this action.

### IV. FACTS

11.     Plaintiff Lawrence Dike is a Black African who was born in Nigeria, a country in West Africa. Plaintiff's ethnicity, cultural and linguistic characteristics are of the Black African people of Nigeria. Although fluent in English, Plaintiff speaks Igbo and speaks with a Nigerian accent.

12.     There are multiple general service hospitals in the Corpus Christi area that are operated by Defendants, and they include the following: Corpus Christi Medical Center – Doctor's Regional, located at 3315 Alameda, Corpus Christi, Texas; Corpus Christi Medical Center – The Heart Hospital located at 7002 Williams Dr., Corpus Christi, Texas 78412; and Corpus Christi Medical Center – Bay Area located at 7101 South Padre Island Drive, Corpus Christi, Texas 78412. Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center entered into a collective bargaining agreement (hereinafter "CBA") with CNA's unions for these locations which was in effect at the time that Plaintiff was employed. In the CBA, Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center is referred to as the "hospital" or the "employer". These hospitals are also affiliated with HCA.

4

13.     On or about June 27, 2016, Plaintiff, Lawrence Dike, was hired by the Corpus Christi Medical Center (hereinafter Medical Center, CCMC, or Defendant) to work as a Certified Nurse Assistant (CNA) and paid $13.52 an hour, along with benefits, including medical and dental coverage. When hired by the Medical Center, Plaintiff was assigned to work in two units: 3 West and Bariatric. The Bariatric unit was Plaintiff's main unit where Ms. Christine Goodwine was the nurse manager for the Medical Center located at 7101 South Padre Island Drive, Corpus Christi, Texas 78412. Ms. Marissa E. Zamora was the nurse manager for the 3 West unit. Both Ms. Goodwine and Ms. Zamora reported to Mr. Jason Sewell, Director of Nursing, who reported to Ms. Kathleen Rubano, Chief Nursing Director for HCA Healthcare, Inc.

14.     As an employee of Defendants, Plaintiff, and other similarly situated employees, may transfer, voluntarily be re-assigned, or be required to work at any hospital owned and operated by Columbia Hospital Corporation of Bay Area and Bay Area Healthcare Group, Ltd. (collectively "CCMC"). These CCMC hospitals are affiliated with HCA. Employees working at CCMC hospitals may also transfer within HCA to other job positions.

15.     HCA provided numerous functions to CCMC facilities, including the following: solicited employees, advertised job positions, processed and screened potential employees; maintained system-wide websites, which incorporates HCA and for which HCA holds a copyright; provided human resources services including policies, investigations, directly administered disciplinary procedures and made decisions regarding the collective bargaining agreement. Between the CCMC and HCA entities, they have common management, common policies including employment policies, common records management including employment records, common employment forms, common and centralized human resources personnel, they have the power to hire and fire employees, they supervise and control employee work schedules or conditions of employment, they

determine the rate and method of payment for employees and they provide employee benefits for the employees of the hospitals identified herein.

16.     HCA also has a "HCA Healthcare Code of Conduct" which applies to employees of HCA and CCMC including Plaintiff while he was employed. This Code provides, "If you have questions regarding our Code of Conduct or encounter any situation that you believe violates provisions of it, you should immediately consult your supervisor, another member of management at your facility, your Facility Human Resources Business Partner, your Facility Ethics and Compliance Officer, the HCA Healthcare Ethics Line (1-800-455-1996 or http://hcahealthcareethicsline.ethix360.com), or the Corporate Ethics and Compliance Officer". Plaintiff utilized the HCA Healthcare Code of Conduct in making his reports of discrimination and retaliation.

17.     When Plaintiff applied for work with Defendants, he was required to apply online using a common computer-based employment management program implemented by HCA. The computer used an identification of "HCA" relevant to the job for which Plaintiff applied. When HCA considered hiring Plaintiff and looked at his CNA background, the methodology used to calculate credited years of experience was standardized across all HCA facilities. The software also compared Plaintiff's experience with that required by HCA. The computer program also used an HCA computer calculation tool. The computer program also referred to the source as "CareersatHCA".

18.     HCA has common ownership and management with Columbia Hospital Corporation of Bay Area, a general partner of Bay Area Healthcare Group, Ltd. The Texas Franchise Tax Public Information Report filed for Columbia Hospital Corporation of Bay Area in 2017 identified the following persons as Officers and Directors which shows the common officers and boards of directors between Columbia Hospital Corporation of Bay Area and HCA as joint employer and/or

acted as an integrated enterprise. The individual's role with Columbia Hospital Corporation of Bay

Area is listed first and then their role with HCA is listed second:

Samuel N. Hazen, Senior Vice President and Director for Columbia Hospital Corporation of Bay Area and he also was President and Chief Operating Officer of HCA since 2016 and is currently CEO of HCA.

Greg Beasley, Senior Vice President for Columbia Hospital Corporation of Bay Area, and he is also President of HCA's Surgery Center Division.

Jon M. Foster, Senior Vice President for Columbia Hospital Corporation of Bay Area and he also serves as President of HCA's American Group.

A. Bruce Moore, Jr., Senior Vice President for Columbia Hospital Corporation of Bay Area and he also serves as Service line and Operations Integration for HCA.

J. William B. Morrow, Senior Vice President and Treasurer for Columbia Hospital Corporation of Bay Area and he also serves as Senior Vice President – Finance & Treasurer for HCA.

Robert A. Waterman, Senior Vice President for Columbia Hospital Corporation of Bay Area and he also serves as Senior Vice President and General Counsel at HCA.

Christopher F. Wyatt, Senior Vice President and Director for Columbia Hospital Corporation of Bay Area and he also serves as Senior Vice President and Controller for HCA.

Kevin A. Ball, Senior Vice President for Columbia Hospital Corporation of Bay Area and he also serves as Senior Corporate Counsel for HCA.

Mike T. Bray, Senior Vice President for Columbia Hospital Corporation of Bay Area and he also serves as Assistant Vice President of HCA.

Natalie H. Cline, Senior Vice President and Secretary for Columbia Hospital Corporation of Bay Area and she also serves as Managing Corporate Counsel at HCA.

Virginia Chase Crocker, Senior Vice President and Assistant Secretary for Columbia Hospital Corporation of Bay Area and she also serves as Senior Counsel at HCA.

John L. Crothers, Senior Vice President for Columbia Hospital Corporation of Bay Area and he also serves as Vice President for HCA.

John M. Franck II, Senior Vice President, Assistant Secretary and Director for Columbia Hospital Corporation of Bay Area and he also serves as Division Reimbursement Director at HCA.

Shirley Fuller Cooper, Vice President for Columbia Hospital Corporation of Bay Area and she also serves as Vice President, Risk & Insurance for HCA.

Gregg Gerken, Vice President for Columbia Hospital Corporation of Bay Area, and he was the Vice President – Development at HCA until 2019.

Dennis Green, Vice President for Columbia Hospital Corporation of Bay Area and he serves as Vice President Enterprise Reporting for HCA.

Ronald Lee Grubbs, Jr., Vice President for Columbia Hospital Corporation of Bay Area, and he served as Vice President & Chief Tax Officer with HCA.

John M. Hackett, Vice President for Columbia Hospital Corporation of Bay Area and he serves as Vice President, Finance at HCA.

Ashley Johnson, Vice President for Columbia Hospital Corporation of Bay Area, and she serves as the Group CFO for HCA.

Seth A. Killingbeck, Vice President and Assistant Secretary for Columbia Hospital Corporation of Bay Area and he is Senior Corporate Counsel at HCA.

L. Erik Larsen, Vice President for Columbia Hospital Corporation of Bay Area and he serves as Vice President – Special Assets Group for HCA.
Dakon Montgomery, Vice President for Columbia Hospital Corporation of Bay Area and he was Senior Vice President, Western Region for HCA.

Phil Neeley, Vice President for Columbia Hospital Corporation of Bay Area, and he was Vice President Operations – Houston and San Antonio, HCA. Ambulatory Surgery Division.

T. Scott Noonan, Vice President for Columbia Hospital Corporation of Bay Area and he also served as Operations Counsel for HCA.

Paul Nicholas, Vice President for Columbia Hospital Corporation of Bay Area and he also served as Regional CFO at HCA.

Katie Roth, Vice President and Assistant Secretary for Columbia Hospital Corporation of Bay Area and she also serves as Senior Operations Counsel at HCA Healthcare, Inc.

Jeff Sliwinski, Vice President for Columbia Hospital Corporation of Bay Area, and he also serves as CFO at HCA Gulf Coast Division.

Greg Swinney, Vice President for Columbia Hospital Corporation of Bay Area, and he serves as CFO, HCA Ambulatory Surgery Division.

David Whalen, Vice President for Columbia Hospital Corporation of Bay Area, and he serves as HCA SVP Business Development, Ambulatory Surgery Division.

 Jay Woodall, Vice President for Columbia Hospital Corporation of Bay Area, and he served as the former CEO of Corpus Christi Medical Center.

Doug L. Downey, Assistant Secretary for Columbia Hospital Corporation of Bay Area and he served as AVP-Tax Compliance at HCA.

Deborah H. Mullin, Assistant Secretary for Columbia Hospital Corporation of Bay Area and she served as Assistant VP, Tax at HCA.

Shirley E. Scharf, Assistant Secretary for Columbia Hospital Corporation of Bay Area and she served as AVP-Tax Compliance at HCA.

Julie Wickwire, Assistant Secretary for Columbia Hospital Corporation of Bay Area and she served as Controller for HCA.

James L. Williams, Assistant Secretary for Columbia Hospital Corporation of Bay Area and he served as Assistant V P-tax Research and Planning for HCA.

19.    The Texas Franchise Tax Public Information Report filed for South Texas Surgicare, Inc.,

the other general partner of Bay Area Healthcare Group, Ltd., in 2017 identified substantially the

same persons as Officers and Directors with HCA, including Beasley, Foster, Hazen, Moore,

Waterman, Wyatt, Ball, Bray, Cline, Crothers, Franck, Gerken, Green, Grubbs, Hackett,

Killingbeck, Morrow, Noonan, Roth, Sliwinski, Swinney, Whalen, Downey, Mullin, Scharf,

Wickwire, and Williams. As such, for Bay Area Healthcare Group, Ltd. And HCA, they share

common officers and boards of directors between these entities as part of its designed joint

employer and/or acted as an integrated enterprise.

20.    According to the Texas Franchise Tax Public Information Reports filed for Columbia

Hospital Corporation of Bay Area and for South Texas Surgicare, Inc. both include the following

statement:

Persons employed in the capacity of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Administrator and Assistant Administrator of facilities owned and/or operated by this Company or by a partnership for which this Company acts as general partner or by a limited liability company for which this company acts as managing member, are hereby authorized to, subject to the company's policies and procedures, (a) manage the facilities and all day-to-day operations, of and the employees and agents of the company at, such facilities, and take such other acts as are necessary or appropriate for the proper

functioning of the facilities, and (b) negotiate and enter into contracts and agreements necessary to conduct the day-today business of such facilities including, but not limited to, physician contracts, personal property leases, purchase agreements, cost reports and similar documents (but specifically excluding any contract or leases relating to real estate, except for leases to tenants in buildings owned or leased to the Company entered into pursuant to the Company's policies and procedures) which with the advice of legal counsel shall be deemed appropriate and advisable, and to execute and deliver Certificates of Resolution required in connection with such contracts and agreements.

This wide-reaching authority of the persons relative to the companies, including CCMC and HCA are part of the overall design to serve and act as Plaintiff's joint employer and/or as a joint enterprise.

21.     HCA announced it named Eric Evans as the new Chief Executive Officer of CCMC wherein HCA made the decision to determine and make the highest-ranking officer of CCMC as part of its joint employers and/or an integrated enterprise.

22.     HCA employees and officers, including but not limited to, Thomas Cook, a Case Manager working for HCA, Stephanie Tice, Director of Corporate Ethics and Compliance for HCA, Vince Goodwine, Vice President of Human Resources for HCA Gulf Coast Division, Kathy Rubano, Chief Nursing Officer at HCA - Corpus Christi Medical Center and HCA legal counsel, had almost a day to day role in the employment and employment decisions relevant to Plaintiff such as supervising him, receiving reports under HCA policies; investigating and responding to his reports and opposition to race and national origin discrimination including EEOC charges. HCA also made decisions regarding not only Plaintiff, but also one of his colleagues named Ms. Brenda Brenyah, a Black African employee, who is Ghanaian. Specifically, Mr. Goodwine investigated Plaintiff's claims of race and national origin discrimination, and Mr. Goodwine made the decision to terminate Plaintiff's employment.

23.     Operationally, Plaintiff's job required him to take care of patients under the guidance and direction of charge nurses like Ailyn Alcoba, Brenda Brenyan, Monica Rivera, Ana Hall, Angela Guerra, Ryan Guerra and others. Plaintiff's charge nurse in the Bariatric unit was Ryan Guerra.

24.     As a Certified Nurse Assistant for the Medical Center, Plaintiff's duties and responsibilities were to work closely and directly with medical patients in a number of different circumstances under the guidance and direction from medical staff responsible for the care of patients within the medical facility. Generally, Plaintiff was responsible for working with and helping patients with various activities, monitoring the vital signs of patients, and reporting the condition of patients, including their physical and emotional conditions, to name a few.

25.     While employed at the Medical Center, Plaintiff satisfactorily performed his duties as a Certified Nurse Assistant and met the performance standards established by the Medical Center. Pursuant to the Collective Bargaining Agreement in effect, Plaintiff's initial 90-day probationary period ended on September 26, 2016. Plaintiff completed his initial orientation at Doctor's Regional Campus which is also part of the network of hospitals owned and operated by Defendants. For Plaintiff's Initial 90 Day Appraisal, on October 7, 2016, Mike Conwill, Director, Human Resources for the Medical Center noted that Plaintiff satisfactorily completed the "initial competencies" and demonstrated satisfactory performance of duties per job description during 90-day evaluation period. What's more, Mr. Conwill commented in Plaintiff's Initial 90 Day Appraisal that Plaintiff was an "Exceptional CNA Asset to the Unit".

26.     The following year, on or about July 5, 2017, Plaintiff was evaluated by one of his supervisor, Ms. Zamora who documented Plaintiff's annual evaluation wherein it noted "Satisfactory Completion of Employment Year", where his Summary of Strengths noted, "Team player, helpful, customer-service oriented and dependable", to name a few. This was backed up by numerous "Kudos 2 U" . . . "for making a difference in our patients' lives" issued by Ms. Zamora.

Moreover, for his first-year anniversary, Ms. Zamora wrote a personal note to Plaintiff "Just want to say thank-you for all your hard work & to let you know I do appreciate you".

27.     Despite Plaintiff's satisfactory work performance and positive contributions to the Medical Center's workplace objectives, for reasons motivated by racial animus, Plaintiff was subjected to concerted efforts by several employees at the Medical Center to undermine and subvert Plaintiff's employment status at the Medical Center. Even worse, over an extended period of time, on account of his race, color and national origin, Plaintiff was subjected to repeated unsubstantiated claims of employee misconduct, which created a hostile work environment. Moreover, when Plaintiff objected to the disparate discriminatory treatment, he was retaliated against when, on March 30, 2018, Plaintiff was wrongfully terminated collectively by the Medical Center and HCA.

28.     The discrimination toward Plaintiff took on many forms. In or around August 2016, the Medical Center staff routinely and regularly changed Plaintiff's work assignments on the premise that certain patients did not want Plaintiff involved in their medical care because he is black. To make matters worse, Plaintiff was constantly ridiculed by the Medical Center's charge nurses and some of its Filipino nurses that African food stinks. Moreover, as a manifestation of the Medical Center's established practice, on a regular basis, Plaintiff was informed by the charge nurse Monica Rivera that she prefers Filipino employees to black employees. These comments and actions were reported by Plaintiff to Ms. Zamora on or about November 2016. However, instead of denouncing or rejecting the preference or practice expressed by Ms. Rivera, Ms. Zamora dismissed Plaintiff's report and complaint and failed to investigate Plaintiff's complaint or take appropriate effective action. For Ms. Zamora, her attitude was that Plaintiff's complaint was nothing more than a joke and by her silence, Ms. Zamora adopted Ms. Rivera's discriminatory practice and attitude.

29.     The following month, on or around December 2016, Plaintiff reported to Ms. Zamora that a co-worker, Kevin Hernandez told Plaintiff to keep a 12-feet distance from him on account of

Plaintiff's African culture and national origin. Mr. Hernandez made it clear to Plaintiff that he cannot flow with Plaintiff the way he flows with Marvin who has the same culture and national origin as him (Mr. Hernandez). Another opportunity to articulate clearly the Medical Center's practice and policy on its standards involving non-discrimination, tolerance and respect for employee racial and ethnic characteristics was ignored. Ms. Zamora's response to Mr. Hernandez's comment was for Plaintiff to ignore Mr. Hernandez and "Kill him with kindness". When Plaintiff explained to Ms. Zamora how her response would be difficult as a practical matter and compromise patient safety, surprisingly, Ms. Zamora insisted that Plaintiff ignore Mr. Hernandez. Even so, the Medical Center failed to take or implement appropriate action against Mr. Hernandez, or unequivocally emphasize to him and Medical Center employees that Mr. Hernandez's comment and behavior is antithetical to its policy and core beliefs.

30.     In response to Plaintiff's discrimination complaints, on or about January 2017, Ms. Zamora wrongfully wrote up Plaintiff for clocking out after 7:30 a.m. However, this was another instance where Plaintiff was singled out to work with a restrictive time frame not applied to other non-black CNAs. Other non-black CNAs were allowed to work the same time period and clock out as Plaintiff, but they were not disciplined.

31.     As part of the evolving scheme to discriminate against Plaintiff on account of his race, color, and national origin, unlike other non-black CNAs, the Medical Center management made false claims against Plaintiff that he was rude, unprofessional, and disrespectful toward co-workers and staff. Plaintiff denied these unfounded assertions and allegations and asked Ms. Zamora for supporting documentation or proof but Ms. Zamora did not provide Plaintiff with any credible documentation of her allegations. Moreover, Plaintiff asked Ms. Zamora to review or exam video recordings available to the Medical Center but Ms. Zamora declined the request from Plaintiff.

13

Consequently, the behavior and conduct permitted by the Medical Center made working conditions for Plaintiff difficult and stressful, which grew worse over time.

32.     The hostile work environment Plaintiff was forced to work in was tolerated by the Medical Center. For example, on or about February 6, 2017, Plaintiff reported to Ms. Zamora that a patient told Plaintiff that she did not "want a black Nigger to take care of her". Ms. Zamora was informed this information was reported to the patient's nurse who responded to Plaintiff to "get over it" and the nurse switched Plaintiff's patient assignment. Even worse, Ms. Zamora told Plaintiff "there is nothing wrong with what the patient said". Ms. Zamora then explained to Plaintiff that "if a patient doesn't want a black person" then the response is "to give that patient somebody who is not black". In support of the Medical Center's policy or practice, Ms. Zamora instructed the charge nurse not to assign any black employee to that patient because that patient does not want black employees.

33.     Astonishingly, on or about June 20, 2017, this same sentiment was expressed and affirmed by Mr. Sewell and the Medical Center's Director of Human Resources, Vince Goodwine, when Mr. Sewell told Plaintiff "If the patient said that I don't want to have someone black take care of me, and we have someone who is not back then we make it happen for the patient." As expressed by Mr. Sewell, this was established, tolerated, and accepted policy and practice for Medical Center nurses, charge nurses, house supervisors and nurse managers.

34.     The Medical Center's efforts to impose its discriminatory scheme against Plaintiff was perpetuated by its false and unsubstantiated claims that Plaintiff left his unit without permission. Before leaving his unit, Plaintiff consistently and regularly got permission from and notified his nurse. Another false narrative postulated by the Medical Center claimed that Plaintiff was sleeping on the job, which he denied. In reality, Plaintiff had reported to a charge nurse or the supervisor that non-black employees were sleeping on the job. What's more, Ms. Zamora and Mr. Sewell,

refused to review stored video and records to verify Plaintiff's claims or take action against non-black employees for sleeping on the job.

35.     Mr. Sewell and other Medical Center management officials consistently pressured Plaintiff to transfer to another unit as their solution to address the racial discrimination problem that was endemic in the unit. Plaintiff rejected this option inasmuch as it was not favorable to him. In response, on or about August 11, 2017, Mr. Sewell informed Plaintiff about an alleged incident that Plaintiff had thrown papers at Kat Ibarra at the nurse's station. Plaintiff unequivocally denied this claim and Plaintiff implored Mr. Sewell to look at the Medical Center video recording records to back up or substantiate Plaintiff's denial. However, without an explanation, Mr. Sewell informed Plaintiff that he would accept Ms. Ibarra's word and not look at the video recording.

36.     Having committed to a course of action to undermine Plaintiff's employment with the Medical Center, Mr. Sewell devised and orchestrated a plan to monitor clandestinely Plaintiff's work duties to see if he could find Plaintiff sleeping while at work. To implement this scheme, on or about June 15, 2017, Mr. Sewell instructed Mr. Kevin Hernandez to follow Plaintiff throughout his work shift to see if he could catch Plaintiff sleeping. This tactic was not used or applied to non-black Medical Center employees under Mr. Sewell's supervision. Plaintiff learned about Mr. Hernandez's project after Mr. Hernandez informed Plaintiff that Mr. Sewell had asked him to spy on Plaintiff and other black employees.

37.     For a considerable period of time, Mr. Sewell contemplated and took steps to destabilize and subvert Plaintiff's employment at the Medical Center. To do so, on or about July 16, 2017, a CNA and nurse, under the instruction of Mr. Sewell, falsely reported that they saw Plaintiff physically assaulting or hitting a patient. And Mr. Sewell threatened to get Plaintiff arrested. With this serious charge, an investigation was conducted that revealed and uncovered that the allegation was not true. The patient and his wife told the Medical Center management that the patient had

made no such complaint against Plaintiff. Without explanation, the Medical Center did not take any corrective action against Mr. Sewell, or any other Medical Center employee, for their intentional actions to inflict emotional distress on Plaintiff for promoting a false claim.

38.    During this same time period, Plaintiff and Ms. Brenyah contacted John MacDonald, HCA Chief Operating Officer Northwest on or about July 13, 2017, about, among other things, racial harassment and discrimination. Afterwards on or about August 5, 2017, Mr. MacDonald responded to their e-mail stating he would contact HR and find out about this investigation. Two days later, Mr. MacDonald contacted Stephanie Ties HCA Ethics Complaint and Thomas Cook, HCA Case Manager. They both promised to Plaintiff and Ms. Brenyah that they had the power to stop the hostile work environment and discrimination. However, on or about October 2, 2017, Ms. Ties contact Plaintiff and told him she could not help Plaintiff.

39.    Not to be deterred by a failed attempt to discriminate against Plaintiff with a concocted patient complaint, Mr. Sewell, on or about September 22, 2017, issued a final warning to Plaintiff after he had notified Mr. Sewell about a complaint about a switched patient assignment by the charge nurse who claimed the patient did not want Plaintiff because he is black.

40.    Also, Plaintiff opposed and reported discriminatory conduct that occurred to another Black African Ghanaian employee, Ms. Brenyah. Plaintiff reported to upper management and Human Resources that the charge nurses were using Plaintiff's race, by using patient's requests to not have Plaintiff assigned to them because of his race, to justify changing his assignments to benefit non-Black and non-Black African employees. This was reported to Ms. Zamora, but she just made excuses and allowed Plaintiff to be subjected to discrimination by patients without taking any appropriate action. This position was also condoned by Mr. Sewell. Instead of the employer investigating the reports of race discrimination and retaliation raised by Plaintiff, it condoned and effected the racially discriminatory and retaliatory write-up of Plaintiff and race discrimination

within the hospital. What's more, Plaintiff and Ms. Brenyah elevated their complaints to HCA Healthcare, Inc. in Nashville, TN by contacting John MacDonald COON HCA on July 31, 2017. Moreover, although Plaintiff shared his frustrations and opposition to discriminatory employment practices to Ms. Rubano, despite her representation to Plaintiff, she never responded to or followed up to meet with Plaintiff about his report.

41.     After a prolonged period of discriminatory treatment, on or about December 22, 2017, Plaintiff filed a discrimination complaint through the Equal Employment Opportunity Commission (EEOC) against the Medical Center and HCA. Notwithstanding notice from the EEOC about Plaintiff's December 22, 2017, discrimination charge, the Medical Center and HCA continued their discriminatory treatment of Plaintiff when he was not given the customary coverage for his breaks.

42.     Several months later, despite Plaintiff's invocation of HCA's internal complaint procedure, which involved Thomas Cook, HCA Case Manager and Kathleen Rubano, Chief Nursing Officer at HCA and others, on or about March 15, 2018, Plaintiff contacted Ms. Rubano about discriminatory treatment and retaliation. But Ms. Rubano did nothing to resolve these concerns and complaints. Instead, on or about March 18, 2018, at a meeting, Plaintiff was asked about his whereabouts at work on February 28, 2018. Although Plaintiff asked for information from the Medical Center and HCA about the inquiry, the Medical Center and HCA management refused to provide Plaintiff with the requested information. During the meeting, Mr. Sewell was asked to explain why other non-black employees were held to a different standard. However, Mr. Sewell refused to respond, and he refused to allow Plaintiff an opportunity to review the alleged video recording of Plaintiff's whereabouts on February 28, 2018.

43.     Within two weeks, without giving Plaintiff a chance to review and comment on the February 28, 2018, video recording held by the Medical Center, in retaliation for Plaintiff's earlier complaints of discrimination, Mr. Vine Goodwine, Vice President of HR HCA called Plaintiff and terminated

him on March 30, 2018. Notwithstanding HCA's knowledge of Plaintiff's claims of unlawful discrimination and retaliation, HCA authorized and approved Mr. Goodwine's termination of Plaintiff. As a result, HCA, through Mr. Goodwine, terminated Plaintiff, effective March 30, 2018.

44.     The retaliation against Plaintiff was also a part of the Medical Center and HCA not to apply and follow their Non-Retaliation Policy, which was approved by HCA's Ethic and Compliance Policy Committee. According to HCA, the scope of this policy "applies" to HCA Healthcare, Inc. (the "Company") and all of its Affiliates operating in the United States ("Affiliates"). Under this policy, "[c]olleagues who knowingly make a false allegation, provide false or misleading information in the course of any investigation, or otherwise act in bad faith may be subject to discipline, up to and including termination". This policy was part of HCA's Code of Conduct whose scope included "[a]ll company-affiliated facilities including, but not limited to, hospitals, ambulatory surgery centers, outpatient imaging centers, home health agencies, physician practices, and all Corporate Departments", which applied to "Qualifying Individuals" like Plaintiff and his co-workers. HCA defined a qualifying individual as "any officer, director, or employee of an HCA Healthcare-affiliated facility".

## V.  <u>FIRST CAUSE OF ACTION</u>

45.     Plaintiff repeats, realleges and incorporates herein as part of his First Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

46.     he was a member of a protected calls by reason of his race;

47.     he suffered and adverse employment action;

48.     he was qualified for the position; and

49.     he was replaced by someone outside the protected calls or was treated differently than similarly situated, non-protected employees.

## VI. <u>SECOND CAUSE OF ACTION</u>

50.     Plaintiff repeats, realleges and incorporates herein as part of his Second Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

51.     he was a member of a protected calls by reason of his color;

52.     he suffered and adverse employment action;

53.     he was qualified for the position; and

54.     he was replaced by someone outside the protected calls or was treated differently than similarly situated, non-protected employees.

## VII. <u>THIRD CAUSE OF ACTION</u>

55.     Plaintiff repeats, realleges and incorporates herein as part of his Third Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

56.     he was a member of a protected class by reason of her national origin;

57.     he suffered an adverse employment action;

58.     he was replaced by someone outside the protected class or was treated differently than similarly-situated, non –protected employees;

59.     he was treated differently than similarly situated, non-protected employees.

## VIII. <u>FOURTH CAUSE OF ACTION</u>

60.     Plaintiff repeats, realleges and incorporates herein as part of his Fourth Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

61.     Defendant engaged in retaliation towards Plaintiff.  The retaliation against Plaintiff can be shown in the following manner:

62.     Plaintiff was an employee who engaged in protected activity or conduct involving a discriminatory practice as it related to conduct covered under the law or participating in any manner in an investigation or protestation of proscribed conduct.

63.     The Defendant took an adverse employment action against Plaintiff.

64.     There is a casual connection between the protected activity and the adverse employment action.

## IX. <u>FIFTH CAUSE OF ACTION</u>

65.     Plaintiff repeats, realleges and incorporates herein as part of his Fifth Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

66.     Plaintiff is a black male and a covered person as contemplated by 42 U.S.C. §1981.

67.     Plaintiff was denied his right to make and enforce contracts and full and equal benefits as contemplated under 42 U.S.C. §1981 with respect to Plaintiff's employment with Defendant.

68.     Plaintiff has been forced to work in a hostile environment on account of his race by the Defendant and as a result of Defendant's conduct, Plaintiff was damaged and sustained injuries consistent with those available under 42 U.S.C. §1981.

## X. <u>SIXTH CAUSE OF ACTION</u>

69.     Plaintiff repeats, realleges and incorporates herein as part of his Sixth Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

70.     Plaintiff will show that Defendant retaliated against him in violation 42 U.S.C. §1981.

71.     Plaintiff engaged in statutory protected activity.

72.     Defendant took adverse employment action against Plaintiff.

73.     There is a causal connection between Plaintiff's protected activity and the adverse employment action.

## XI. <u>SEVENTH CAUSE OF ACTION</u>

74.     Plaintiff repeats, realleges and incorporates herein as part of his Seventh Cause of Action paragraphs 1 through 44 of this Plaintiff's Second Amended Original Complaint, inclusive and in their entirety, and further alleges:

75.     Defendant created a hostile work environment in violation of 42 U.S.C. §1981 and Plaintiff would show that the harassment was based upon the following:

76.     The harassment was based on race.

77.     The harassment was subjectively and objectively hostile.

78.     The harassment was sufficiently severe or pervasive to interfere with Plaintiff's ability to perform his assigned duties.

## X11. <u>JURY DEMAND</u>

79.     Plaintiff hereby demands and requests a jury trial.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff requests that Plaintiff have:

1.      Judgment entered for the Plaintiff against Defendant for damages.

2.      Award Plaintiff equitable relief and actual damages, including back pay and benefits pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f)(g) et seq and 42 U.S.C. §1981a.

3.      Award Plaintiff front pay pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-(f)(g).

4.      Award Plaintiff damages for physical and mental pain and suffering, including compensatory and punitive damages in connection with those claims made herein pursuant to 42 U.S.C. §2000e, et seq and 42 U.S.C. §1981a(b).

5.      Attorney's fees and costs as provided by 42 U.S.C. §2000e-5(k), 42 U.S.C. §1988.

6.      Pre-judgment interest were permitted by law.

7.      Interest at the legal rate on the foregoing sums from the date of judgment until paid.

8.      Such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

LAW OFFICE OF CHARLES C. SMITH, PLLC


/s/Charles C. Smith
Charles C. Smith
615 N. Upper Broadway, Suite 1710
Corpus Christi, Texas  78401
State Bar No.:  18550210
Admission No.:  4312
Telephone No.:  (361) 883-1055
Facsimile No.:  (361) 883-4041
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, Charles C. Smith, hereby certify that on the 18th day of March 2022, a true and correct

copy of the *Plaintiff's Second Amended Original Complaint* was electronically filed with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the following:

***Via E-filing with CM/ECF System***
***and Via E-mail: sarah.morton@morganlewis.com***
Morgan, Lewis & Bockius LLP
Attn: Sarah B. Morton,
     Attorney at Law
1000 Louisiana Street, Suite 7000
Houston, Texas 77002-5005