United States District Court
Southern District of Texas
**ENTERED**
January 02, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **LAWRENCE DIKE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **COLUMBIA HOSPITAL** | § | **CIVIL ACTION NO. 2:21-cv-308** |
| **CORPORATION OF BAY AREA,** | § | |
| **INDIVIDUALLY AND D/B/A CORPUS** | § | |
| **CHRISTI MEDICAL CENTER; BAY** | § | |
| **AREA HEALTHCARE GROUP, LTD.,** | § | |
| **INDIVIDUALLY AND D/B/A CORPUS** | § | |
| **CHRISTI MEDICAL CENTER; AND** | § | |
| **HCA HEALTHCARE, INC.,** | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER

This is an employment discrimination case brought by Plaintiff Lawrence Dike ("Dike") against Columbia Hospital Corporation of Bay Area, Individually and d/b/a Corpus Christi Medical Center ("Columbia") (his W-2 employer); Bay Area Healthcare Group, Ltd., Individually and d/b/a Corpus Christi Medical Center ("Bay Area") (the owner/operator of CCMC); and HCA Healthcare, Inc. ("HCA") (a nonoperating holding company). HCA was previously dismissed after Dike agreed it was not a property party to this action. *See* Minute Entry 10/4/2023. Now pending before the Court is Defendants Columbia and Bay Area's joint Motion for Summary Judgment (D.E. 38), to which Dike has responded (D.E. 43) and Defendants have replied (D.E. 46). For the reasons set forth below, Defendants' motion is granted.

1

## I. Factual Background

Dike began working as a Certified Nursing Assistant (CNA) at Corpus Christi Medical Center (CCMC or the "Hospital") on June 27, 2016. Dike Dep., D.E. 38-2, p. 102. He was hired by the nurse manager over the 3 West Department, Esther Marissa Zamora, to whom he reported until Zamora left the position in July 2017. *Id.* at 102–03; Zamora Dep., D.E. 38-4, p. 6. Beginning in January 2018, Dike worked on the bariatric unit, overseen by charge nurse Ryan Guerra, nurse manager Christine Goodwin, and Director of Patient Care Services Jason Sewell. Dike Dep. at 270; Sewell Dep., D.E. 38-3, pp. 8–11. Dike worked the night shift from 7:00 P.M. to 7:30 A.M. Zamora Dep. at 9.

### A. Dike's Work Performance and Disciplinary History

In July and August 2016, Zamora counseled Dike regarding his timekeeping practices, including that he was clocking in more than seven minutes before his shift start time and failing to clock out for his 30-minute lunch break, per CCMC policy. Zamora 7/18/16 and 8/3/16 emails, D.E. 39-1; CCMC Time Recording Policy, D.E. 39-2. On January 9, 2017, Zamora spoke with Dike about staying past 7:30 A.M., explaining there was no reason for a CNA to incur end-of-shift overtime. 1/9/17 Zamora Note, D.E. 39-3; Dike Time Records, D.E. 39-4. One week later, Zamora issued Dike a verbal warning after he again clocked out after 8:00 A.M. 1/16/17 Verbal Warning–Attendance, D.E. 39-5.

In late 2016, Zamora began receiving complaints regarding Dike's conduct at work, including that he: was rude and unprofessional; was nonresponsive and sleeping on the job; had twice left a patient in his own stool who needed to be cleaned; and had hit on a patient's granddaughter when she stayed overnight. Zamora Dep. at 24–25, 29; Garcia 9/30/16

2

Email, D.E. 39-7; Taylor 10/18/16 Email, D.E. 39-8. On December 18, 2016, Zamora coached Dike after receiving an email from RN Justyn Cruz-Aedo complaining that Dike had yelled at Cruz-Aedo and refused to complete assigned tasks. Cruz-Aedo 12/17/16 Email, D.E. 39-14. On January 16, 2017, Zamora issued Dike a verbal warning when his behavior had not improved. Cruz-Aedo 1/14/2017 Email, D.E. 39-16; 1/16/17 Verbal Warning–Behavior, D.E. 39-15 (noting that "numerous staff members" had complained about Dike's "behavior and conduct").

On February 6, 2017, Zamora gave Dike a written warning based on a report that he had yelled out at a patient in a rude and disrespectful manner, along with further complaints from his coworkers regarding his performance and behavior. 2/6/2017 Written Warning–Conduct/Behavior, D.E. 39-17; Ortiz 1/28/17 Email, D.E. 39-18 (complaining that Dike had refused to answer calls, change a wet patient, or complete assigned tasks).

On March 30, 2017, Zamora met with RN Ailyn Alcober after receiving an email from Dike complaining that Alcober had bullied and disrespected him when instructing him to take a patient's vital signs. Dike 3/27/17 Email, D.E. 39-19. Alcober stated that Dike was the one being snappy and rude and that she had received numerous complaints that Dike would sleep while doing 1:1 patient assignments. Zamora Notes, *Id.*

On May 6, 2017, a staff member complained that Dike had been caught sleeping and snoring the previous week while doing a patient 1:1. Sanchez 5/6/2017 Email, D.E. 39-20.

On May 15, 2017, charge nurse Stephanie Myers complained that she had twice caught Dike sleeping and had to physically wake him up, and that he disappeared for lunch for over 45 minutes. Myers 5/15/17 Email, D.E. 39-21.

On August 6, 2017, CNA Kat Ibarra complained that Dike had yelled at her to give him a report and tossed his papers at her earlier that day at shift change. Ibarra 8/6/17 Email, D.E. 40-7. Sewell interviewed Ibarra, Dike, and Stephanie, who had witnessed the encounter. Sewell 8/11/2017 Investigation Notes, D.E. 40-8. Stephanie and Ibarra stated that Dike became angry, aggressive, and loud when Ibarra would not stop charting to give him her report right away and that it escalated to the point that Stephanie had to pull Dike away before he would calm down. *Id.* Dike responded that he did nothing wrong and that they were against him. *Id.* Sewell asked Dike if he was aware of the tone and body language he was displaying at that moment (raising his voice, moving his hands a lot, and hitting his thighs) and how that might be perceived by others. *Id.* Sewell also reminded Dike that he had exhibited similar tone and demeanor in a recent meeting with HR. *Id.*

On September 9, 2017, Dike emailed Sewell to complain about being pulled from a 1:1 patient assignment and replaced with another CNA after he had reported a patient safety issue. Dike 9/9/17 Email, D.E. 40-9. Sewell's investigation revealed that the patient assignment was changed after a sitter had become available, which would allow Dike to work on the floor. Sewell 9/13/2017 Investigation Notes, D.E. 40-10. Upon learning he was pulled from the assignment, Dike was angry, got up in the charge nurse's face, and refused to come out of the patient's room. *Id.* On September 22, 2017, Sewell gave Dike a final written warning for showing "aggressive and confrontational" behavior towards staff

4

in the August and September incidents, despite receiving "coaching and direction about his communication and interaction with coworkers and patients" on "multiple occasions." 9/22/2017 Final Written Warning–Conduct/Behavior, D.E. 40-11.

In November 2017, Dike was injured in a motor vehicle accident and went on a medical leave of absence until January 2018. Dike Dep. at 270–71. Upon his return, Dike worked primarily in the bariatric unit, where he was the only CNA on his shift. *Id.*

### B. Dike's Complaints to CCMC

On May 19, 2017, Dike emailed Sewell complaining of, among other things, race discrimination. Dike 5/19/2017 Email, D.E. 39-22. Dike stated that his first 90 days of employment had been fine, but then: (1) his fellow CNA Kelvin [*sic*., later identified as Kevin Hernandez] told him to "give him 12 feet while talking or dealing with him because am different both culture and orientation because he cannot flow with me like the way he flow with Marvin that has the same color orientation with him"; (2) "a patient kicked me out of her room because of my gender," stating, "I don't need any male nurse I need my nurse or a female nurses to clean me," and that Zamora retaliated by writing Dike up; (3) charge nurse Cynthia "lied on me that she told me to set up a patient room [and] I never did it" and "was being vindictive to me because she wants me to work beyond my scope"; (4) Ailyn Alcober "disrespected me in a patient room as well as running me down with foreign language," and after Dike complained to Zamora, "Ailyn got other Philippine nurses on 3west against me, so they keep frustrating me by speaking their foreign language and finding faults on me each time we are working"; (5) "Marissa called me for an unsubstantiated complain[t]" about leaving the unit when Dike went to sit with a patient

1:1 and then had to use the restroom; meanwhile Angela Guerra "send[s] CNAs out of the unit without clocking out to buy food for more than hour twenty minutes" or leaves the unit herself to go to Whataburger but is not written up; and (6) Angela reported Dike for sleeping, but "all the nurses and CNAs sleep at one time or the other." *Id.* Sewell and CCMC's VP of HR, Vince Goodwine, investigated Dike's complaints. Sewell Decl., D.E. 39-12, ¶ 4.

On May 28, 2017, Dike emailed Sewell to "report consistent racial harassment" from Alcober and other Filipino nurses on 3 West. Dike 5/28/17 Email, D.E. 40-1. Dike complained that Alcober had yelled at him, bullied and harassed him in a patient's room, and told him to "shut up." *Id.* Zamora was also informed of this event by house supervisor Jason Sly. Sly 5/28/17 Email, D.E. 40-2. Zamora met with Alcober on June 2, 2017, and reiterated the CCMC standards of behavior to treat employees with courtesy and respect. Zamora 6/4/17 Email, D.E. 40-3.

On June 9, 2017, Dike complained to Zamora about Alcober again being rude to him. Zamora Notes, D.E. 40-4. Zamora called Alcober and charge nurse Angela Guerra into her office with Dike to resolve the conflict. *Id.* Zamora concluded that the incident on May 28 was a misunderstanding on Alcober's part. *Id.* She further stated in her notes that "there were moments in our conversation that [Dike] became frustrated, emotional, and raised his voice volume almost yelling." *Id.* After Guerra and Alcober left the office, Dike stayed to reiterate that he was "tired of this treatment." *Id.* Zamora responded that "going forward [she] wanted to know about each and every moment he feels mistreated immediately" and that "anyone being mistreated on our unit will not be tolerated." *Id.*

On June 19, 2017, Dike emailed Sewell and Goodwine to complain about Alcober and Hernandez, repeating his June 9 complaint to Zamora and adding that Hernandez had asked Dike to switch patient assignments on June 10 because, according to Hernandez, the patient said she did not want Dike taking care of her because he is Black. Dike 6/19/17 Email, D.E. 40-6. On June 20, 2017, Sewell and Goodwine met with Dike to discuss their investigation into his complaints and the fact that it did not reveal a violation of CCMC's policy on race discrimination and harassment. Sewell Decl. at ¶ 6.

In August 2017, Dike complained to John McDonald, CCMC's Chief Operations Officer and Ethics and Compliance Officer, regarding discrimination and retaliation. McDonald Decl., D.E. 40-28, ¶ 4. It was determined that, because Dike was a unionized employee, his claims were governed by the collective bargaining agreement's grievance process. *Id.*

On December 22, 2017, Dike filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on race, color, and national original, as well as retaliation, between June 27, 2016, and December 22, 2017. 12/22/17 EEOC Charge, D.E. 37-3.

In March 2018, Dike complained via email and letter to CCMC's Chief Nursing Officer (CNO), Kathy Rubano. Dike's letter mentioned that he had made a complaint about racial discrimination and harassment to Sewell, but it mainly focused on his allegations that other employees had been sleeping on the job. Dike Letter, D.E. 40-13. His email attached photos of coworkers who had fallen asleep at the nurse's station, but it made no

mention of discrimination, harassment, or retaliation on the basis of race, color, or national origin. Dike 3/21/2018 Email, D.E. 40-14.

### C. Dike's Termination

In the early morning hours of March 1, 2018, Dike left his unit for his 30-minute lunch break. Sewell 3/1/18–3/2/18 Investigation Notes, D.E. 40-16. Charge nurse Ryan Guerra and RN Monique Jackson reported that Dike did not return until much later. *Id.* Sewell investigated by checking Dike's time records, seeking surveillance camera footage from Security Manager Jerry Vesely, and reviewing Vesely's summary of the video footage. *Id.*, Goodwine Dep. at 33–34, 52–53.

Based on his review of the video footage, Vesely concluded that Dike left his unit at approximately 3:00 A.M. and walked to a medical office building connected to the hospital. Vesely Decl., D.E. 40-18, ¶ 6. At 3:03 A.M., Dike walked down a hallway into the Day Surgery unit, which was not staffed in the evening, and walked just beyond the view of the camera, at which point he entered either a conference room or the chapel. *Id.* Dike reappeared on the camera at 4:32 A.M., when the hallway camera showed a shadow on the floor and then Dike walking back down the deserted hallway, with subsequent cameras showing him walking back toward his unit via a different route. *Id.*; *see also* Video Files, D.E. 40-19; Vesely 3/23/18 Email, D.E. 40-25; Vesely 3/27/18 Email, D.E. 40-26.

Goodwine and Sewell met with Dike twice to discuss the situation and get an explanation for his absence on the night in question, but Dike could not or would not explain his whereabouts. Goodwine Dep., D.E. 40-17, pp. 38–41; 3/30/18 Audio Recording, D.E. 40-20; 3/30/18 Mtg. Tr., D.E. 40-21. Based on this investigation and the

fact that Dike was on a final written warning, Goodwine recommended to Rubano, the ultimate decisionmaker, that Dike be terminated. Goodwine Dep. at 20–22, 69–70. Rubano approved the recommendation, and Dike's employment was terminated on March 30, 2018. Rubano Dep. at 35–37, 41–42; 3/30/2018 Termination Notice, D.E. 40-27. Dike amended his EEOC charge following his termination. 4/27/18 Am. EEOC Charge, D.E. 37-4.

## II. Dike's Allegations in the Present Lawsuit

On December 23, 2021, Dike filed the present action alleging causes of action for discrimination, hostile work environment, and retaliation based on his race, color, and national origin under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, including violations of his right to make and enforce contracts under § 1981. Defendants now move for summary judgment on all claims.

## III. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In making this determination, the court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and

drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

The court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e); *see also Cormier v. Pennzoil Expl. & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 248. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

10

## IV. Motions to Strike

As a preliminary matter, Dike has filed objections to and/or moved to strike portions of Defendants' summary judgment evidence. D.E. 43, ¶¶ 1–29. The Court has considered both the evidence proffered and Dike's objections, and to the extent the Court has regarded portions of the evidence as relevant, admissible, and necessary to the resolution of particular summary judgment issues, it hereby overrules the evidentiary objections. To the extent the Court has not relied on other evidence about which Dike complains, the remaining objections are denied as moot.

## V. Analysis

### A. Title VII

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination by employers "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e2(a). Before a plaintiff may file suit in federal court under Title VII, he is required to file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(f)(1); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). "The scope of a Title VII complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Thomas v. Tex. Dept. of Crim. Just.*, 220 F.3d 389, 395 (5th Cir. 2000); *Hernandez v. City of Corpus Christi*, 820 F. Supp. 2d 781, 793 (S.D. Tex. 2011).

**1. Conduct Alleged to have Violated Title VII**

Dike's initial EEOC Charge alleged discrimination based on race, color, and national original, as well as retaliation, between June 27, 2016, and December 22, 2017. He described the particulars as follows:

> On June 27, 2016, I was hired as a full-time CAN [*sic.*]. In December 2016, my fellow CNA co-worker told me to always stay 12 feet away while working with him because of my skin color, culture and orientation. I complained of racial discrimination to my manager. In June 2017, the same CNA, caused my whole patient assignment to be changed by my Charge nurse because he said the patient did not want me because of my skin color. On June 8, 2017, a Phillipine [*sic.*] Nurse, Alcoba, yelled and belittled me in front of patient. I reported this harassment. A group of Phillipine [*sic.*] nurses started harassing and retaliating against me. In June 2017, I made a formal complaint of racial discrimination, harassment and retaliation to upper management. I was offered a transfer, but I declined. This treatment continued. In July 2017, I was accused of stricken [*sic.*] a patient. After the investigation, I was cleared. In September 2017, my charge nurse changed my assignments saying the patient did not want me because of my skin color. I reported this to the Director. On Sesptember [*sic.*] 22, 2017, the Director handed me a write up for supposedly being too aggressive to the charge nurse and supervisor when they changed my patient assignment. In spite of all my efforts to correct these discriminatory issues with management, they have not been resolved.

12/22/17 EEOC Charge.

Dike amended his Charge on April 27, 2018, and included two separate amendments alleging discrimination based on race, color, and national original, as well as retaliation, between June 27, 2016, and March 30, 2018. D.E. 37-4. The first amendment stated:

> In March 2017, I reported Ms. Alcoba, a Filipino nurse who was harassing me, even in front of patients and family, to my manager Ms. Zamora. Also, a group of Filipino nurses and

associates started harassing me and retaliating me repeatedly. In June 2017, the same CNA Kevin, caused my whole patient assignment to be changed by my Charge nurse because he said the patient did not want me because of my skin color. Monica and Angela charge nurses repeatedly told me my African food stink and always leave the break room closing the door when I'm eating. I was offered a less desirable transfer, but I declined when I realized HR did not want to address the real issues on the unit or censure the real culprits. In July 2017, Jason, Director of Nursing, asked Kevin to spy on me following me to another unit to harass me in a patient room. The next morning, I emailed Jason about the harassment. When I returned to work in the night, suddenly I was falsely accused of striking a patient. It took the personal intervention of the patient and the wife to save me. After all the investigation, I was cleared. In September 2017, my charge nurse again changed my assignments saying the patient did not want me because of my skin color.

4/27/18 Am. EEOC Charge.

Dike's second amendment, addressing retaliation after he filed his Initial EEOC

Charge as well as his termination, is summarized as follows:

- From January to March 2018, charge nurses refused to give Dike coverage for authorized breaks on the bariatric unit. Other, non-Black CNAs on the unit were given coverage to take breaks.

- Dike's immediate supervisors and charge nurses refused to assist him in transferring his patients who were considered maximum risk for falling. Instead, they were sleeping and would get angry when he would wake them.

- Dike reported his concerns in person and via text and email to his unit manager, the CNO, and the HR Director, but no one ever made any attempt to address his concerns.

- The third week of March 2018, Dike was asked by his unit manager to meet with her and Sewell about his whereabouts on February 28, 2018. Based on Sewell's previous retaliation anytime Dike made a complaint about discrimination or

harassment, Dike immediately contacted his Union representative. CMCC refused to provide the Union with requested information regarding the investigation.

- During two investigatory meetings between Dike and CMCC, management provided inconsistent information and required Dike to explain his whereabouts the night of February 28, 2018. CMCC refused to allow Dike to view video footage to refresh his memory. Instead, they read aloud a security report describing the video, which was inconsistent with prior information. CMCC ultimately used an "unauthorized break" as a pretext to terminate Dike's employment in retaliation for making an EEOC complaint and also for complaining internally about continuous discrimination and other safety issues.

*Id.*

### 2. Dike's Title VII Discrimination Claim

#### a. Legal Standard

To establish a prima facie case of racial discrimination under Title VII, a plaintiff must show that he: (1) belongs to a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class, or that other similarly situated persons were treated more favorably. *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). To adequately prove an adverse employment action, the plaintiff need not show discrimination with respect to an "ultimate employment decision." *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 506 (5th Cir. 2023). "Instead, a plaintiff need only show that [he] was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the 'terms, conditions, or privileges of employment.'" *Id.*; *see Young v. City of Hous.*, 906 F.2d 177, 182 (5th Cir. 1990).

14

A plaintiff may present his case of discriminatory intent by direct or circumstantial evidence, or both. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). "Direct evidence" is evidence that, if believed, is sufficient to prove discriminatory intent without inference, presumption, or resort to other evidence. *Haas v. Advo Syst., Inc.*, 168 F.3d 732, 733–34 (5th Cir. 1999). If the plaintiff produces only circumstantial evidence of discrimination, the court's inquiry is guided by the *McDonnell Douglas* burden shifting paradigm. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, the allocation of the burden of production and the order for presentation of proof is as follows: (1) the plaintiff must first establish a prima facie case of discrimination; (2) if the plaintiff meets his burden, then the burden of production shifts to the defendant to produce evidence of a legitimate nondiscriminatory reason for its actions; and (3) if the defendant produces a legitimate reason, then the presumption of discrimination vanishes, and the plaintiff must demonstrate a genuine issue of material fact that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142–43 (2000). If the plaintiff employee cannot establish a prima facie case, then the defendant need not present any reason for its action. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### b. Analysis

There is no dispute that Dike belongs to a protected class (Black and Nigerian), that he was qualified for his position as a CNA, or that he was ultimately terminated from his job. However, he has offered no evidence that he was terminated based on his race, color, or national origin; that he was replaced by someone outside of his protected class; or that similarly situated employees were treated more favorably.

### i. Termination

Defendants have offered a legitimate, nondiscriminatory reason for Dike's termination: while on a final written warning after numerous incidents—including failing to follow time recording policies, failing to meet job expectations, sleeping on the job, insubordination, and rude/inappropriate conduct towards patients and staff—Dike was absent without permission from his unit for approximately 90 minutes in the early morning hours of March 1, 2018. Dike was given the opportunity to explain his whereabouts when he met with Goodwine and Sewell to discuss the issue, but he was unable to do so. Nearly six years later, he has still provided no explanation for his disappearance. Defendants have offered evidence that other, non-Black employees were investigated and terminated for similar conduct. *See* Vesely Decl. at ¶ 11; Employee Disciplinary Records, D.E. 41-4.

Dike does not rebut the evidence of his poor job performance or his history of prior disciplinary actions, including the fact that he was on a final written warning at the time of his unexplained absence. He also does not deny that he was away from his unit for more than 90 minutes on the night in question, and he has offered no evidence that he was given permission or was otherwise authorized to take an extended break while on the clock. Dike

maintains there was a "scheme" to terminate him and that Defendants' proffered reason was pretextual, but he has offered no competent evidence to support this claim. He has also failed to cite any evidence that his race, color, or national origin were a factor in the decision to terminate his employment. To the contrary, Dike conceded that he did not believe Rubano—who made the decision to terminate his employment—discriminated against or harassed him in any way. Dike Dep. at 257. Dike also could not identify any inappropriate comments made by Goodwine—who recommended termination—that were "offensive, racially inappropriate or addressing national origin." *Id.* at 263–65.

### ii. Failure to Provide Lunch Breaks

Dike alleges that non-Black employees were treated more favorably with regard to lunch breaks. Dike testified that he did not have a "lunch buddy" because he was the only CNA assigned to the bariatric unit during the night shift, and his charge nurses refused to give him coverage for authorized breaks. Dike Dep. at 270–71. However, Daniel Rodriguez, a white CNA who also worked on the bariatric unit, told Dike that nurses would cover for him to have a lunch break. *Id.* at 275–76. Rodriguez's statement is hearsay. *See* FED. R. EVID. 801. Dike has failed to offer any competent summary judgment in support of his claim that non-Black CNAs were given coverage for lunch breaks while he was not.

For the reasons stated above, Dike's Title VII discrimination claim is dismissed.

### 3. Dike's Title VII Hostile Work Environment Claim

#### a. Legal Standard

To establish a prima facie case of a hostile work environment under Title VII, a plaintiff must demonstrate the following: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew, or should have known, of the harassment in question and failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

The Supreme Court has explained that in determining whether workplace conditions are a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Tex. Dept. of Crim. Just.*, 269 F. App'x 457, 463–64 (5th Cir. 2008). "[T]he challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Commc'ns LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 874 (5th Cir. 1999)). "Title VII . . . is not a

18

'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 163 (5th Cir. 2007) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). However, a working environment that is permeated by racial slurs, discrimination, intimidation, ridicule, insult, and harassment is abusive, threatens the emotional and psychological health of the employee, and alters the conditions of employment. *See Harris*, 510 U.S. at 21; *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358 (11th Cir. 1982).

### b. Analysis

As detailed below, the Court finds the "harassment" about which Dike complained was either unsubstantiated, not related to his race/color/national origin, or otherwise not sufficiently severe and pervasive to support a hostile work environment claim. He has also failed to rebut Defendants' evidence that CCMC investigated and took prompt remedial action each time he complained. *See Hudson v. Lincare, Inc.*, 58 F.4th 222, 230 (5th Cir. 2023) (employer not liable when it takes "prompt remedial action" that is "reasonably calculated to end the harassment").

### i. Twelve Feet of Space

Dike emailed Sewell on May 19, 2017, to complain about "recent hostile and discriminating treatment," including a request by fellow CNA Kevin Hernandez to keep 12 feet of space between them due to Dike's "culture differences" and "color orientation." In response, Sewell met with Hernandez, who admitted that he did request 12 feet of space

because Dike was overly touchy, often invaded his personal space, and had tried to hug him. Sewell Decl. at ¶ 5. Dike admitted that he tried to hug Hernandez. Dike Dep. at 151–53. Hernandez stated that Dike seemed offended that he did not want to hug him because Hernandez would sometimes exchange hugs with their coworker Marvin, whom Hernandez was close friends with. Sewell Decl. at ¶ 5. Hernandez said he explained to Dike that it was just their culture (they are both Hispanic) and relationship and that he didn't have that same culture and relationship with Dike. *Id.* Sewell told Hernandez that he was entitled to his personal space but that it was unreasonable to demand 12 feet because he and Dike had to be able to work together to provide patient care. *Id.* Goodwine and Sewell reported these findings to Dike in a meeting on June 20, 2017. *Id.* at ¶ 6. Hernandez apologized to Dike at Zamora's direction in a meeting in Zamora's office, but he remained standoffish after that. Dike Dep. at 155–56. Dike has failed to rebut Defendants' summary judgment evidence that CCMC took prompt remedial action in response to his complaints regarding Hernandez.

### ii.  Change of Patient Assignments

Dike's EEOC Charge alleged that on two occasions—June 2017 and September 2017—his patient assignments were changed because of his race. His Second Amended Complaint and deposition testimony included numerous other allegations related to this claim.

Dike testified that, beginning in August 2016, three charge nurses (Anna Hall, Monica Rivera, and Angela Guerra) harassed him by having his patient assignment changed every time he worked with them—approximately twice per week—because

patients did not want a Black person caring for them. Dike Dep. at 112, 121–23. Dike said that he reported to Zamora each time his patient assignment was changed, and she responded to "kill them with smile" and that "we make it happen for the patient." *Id.* at 123–24. Dike testified that he did not report the changes in his patient assignments to HR until "later on," when he complained about these three specific nurses changing his patient assignments in an email to Sewell in June 2017, as well as during a meeting with Goodwine and Sewell that same month. *Id.* at 128, 134, 138. Dike further testified that, on two occasions in February 2017, a patient told him they did not want a n***** taking care of them. *Id.* at 114. Dike stated that he reported the comments to Zamora, who spoke with the patient and then wrote Dike up for being rude to the patient. *Id.* at 116–17, 120. Following Zamora's investigation, Dike's charge nurse removed the patient from Dike's care. *Id.* at 117. According to Dike, a second female patient told him she didn't want "the male freaking n[*****] to take care of her" in March 2017. *Id.* at 118. It is unclear whether his patient assignment was changed; by the time Dike reported the comment to Zamora, the patient had already been discharged. *Id.* at 120–21.

The documentary evidence shows that Dike received a written warning on February 6, 2017, after a patient complained that he yelled in a rude and disrespectful manner and she demanded he leave the room and not return. Under Employee Comments, Dike wrote, "The patient statement against me is not valid is [] false. She was very rude to me and I reported it to Emy the nurse as I humbly disagree with her." D.E. 39-17. In his May 19, 2017 email to Sewell, Dike reported that he was written up after he was kicked out of a female patient's room who wanted to be cleaned by a female nurse. Neither the written

21

warning nor Dike's email complained that the patient used the N-word or that Dike was reassigned because the patient wanted a caregiver of a different race. Dike also did not mention the three charge nurses who allegedly changed his patient assignment twice per week based on his race.

In his June 19, 2017 email to Sewell, Dike complained that, nine days earlier, Hernandez had asked to switch patient assignments because Dike's patient said she did not want a Black caregiver. Dike believed that Hernandez either made up the story to hurt him or had "incited" the patient about Dike's color, since Dike had cared for the same patient earlier in the day without issue. There was no mention that Dike's patient assignments were being changed on a regular basis due to his race.

In his September 9, 2017 email to Sewell, Dike complained, "[T]his is not the first time charge nurses have switched my pt assignment because I reported pt safety issues or my skin color (with the excuse that a pt. said she does not want me because I'm black)." Dike referenced a single female patient who objected to his race, not multiple patients over the course of a year.

The summary judgment evidence shows that, at least once, Dike complained to CCMC that he was reassigned because a patient did not want him to treat them because he is Black. Goodwine conducted employee interviews regarding this incident and Dike's other complaints of racial discrimination; however, Sewell was unable to personally address this issue with the patient, who had already been discharged by the time Dike complained. Sewell Dep. at 31–32. CCMC did not have a policy regarding how to handle race-based patient requests, but instead allowed the charge nurse to handle any requests on

a case-by-case basis. *Id.* at 28; Zamora Dep. at 23–24. Sewell testified that CCMC did not want to put its employees "in a situation where they're going to be, you know, caring for somebody who [has] kind of bias like that. . . . So if we can accommodate the assignment and give them a better work environment, then we would want that." Sewell Dep. at 27. CCMC also wanted to "make sure the patients have a voice" because "[t]hey have the right to . . . refuse medical treatment, participate in treatment." *Id.* at 29. Goodwine testified similarly that CCMC tries to have "the best interests of both parties at stake here" and will accommodate patients' requests if possible in order to avoid placing an employee in a "hostile environment based on race." Goodwine Dep. at 122.

Courts outside the Fifth Circuit have held that a healthcare provider's policy or practice of assigning or excluding caretakers based on patients' racial preferences may create a hostile work environment and/or constitute employment discrimination. *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010) (work environment at nursing home, which included a written policy of not allowing black nursing assistant to provide care for or even enter the room of resident who did not want care from Black assistants, was hostile or abusive); *Dysart v. Palms of Pasadena Hosp.*, 89 F. Supp. 3d 1311 (M.D. Fla. 2015) (stressing that hospital's "policy" that Patient X, who had been mugged by a Black male, should not be treated by any Black or dark-skinned people amounted to a "'no Blacks allowed' sign posted on the patient's door" and "was approved all the way up the chain of command, including by the CEO"); *Blackburn v State*, 375 P.3d 1076 (Wash. 2016) (state hospital's staffing directive that explicitly prevented Black employees from working on particular ward over course of one weekend due to their race

constituted disparate treatment but did not rise to the level of severe or pervasive harassment to support a hostile work environment claim).

Unlike these cases, CCMC did not have a policy or assignment system based around patients' racial preferences. There is no evidence, besides Dike's own testimony, showing that his charge nurses routinely changed his patient assignments based on his race. Dike also cites to no other evidence supporting his claim that Zamora dismissed his complaints about being reassigned or wrote him up after he complained that a patient used a racial slur towards him. "Self-serving testimony, without more evidence, will not defeat summary judgment." *Smith v. DeTar Hosp. LLC*, 2012 WL 2871673, at \*14 (S.D. Tex. July 11, 2012) (citing *Sanchez v. Dall./Fort Worth Int'l Airport Bd.*, 438 F. App'x 343, 346 (5th Cir. 2011); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 & n. 49 (5th Cir. 2005)).

The Court finds Dike's complaint as to race-based patient assignments does not raise a fact issue as to hostile work environment or any other employment discrimination claim. *See Crane v. Mary Free Bed Rehab. Hosp.*, 2015 WL 10791897, at \*6 (W.D. Mich. Mar. 13, 2015), *aff'd*, 634 F. App'x 518 (6th Cir. 2015), (recognizing that an employer's race-based assignment of duties may constitute adverse employment action even without a change in pay, benefits, prestige, or responsibilities, but finding there was no adverse employment action because impact on employee was temporary and *de minimus*); *Deasfernandez v. Beaumont Health Sys.*, 154 F. Supp. 3d 534, 539 (E.D. Mich. 2015) (hospital's practice of recording patients' racial preferences on intake forms, which were kept in the administrative office and not distributed to the nurses daily, did not create a hostile work environment). Dike has also failed to rebut Defendants' summary judgment

evidence that CCMC took prompt remedial action in response to his documented complaints.

### iii. Harassment by Alcober

It is undisputed that Dike complained about treatment by RN Ailyn Alcober on numerous occasions. His May 19, 2017 email to Sewell complained that Alcober "disrespected me in a patient room as well as running me down with foreign language," and after he complained to Zamora, "Ailyn got other Philippine nurses on 3west against me." In response to Dike's May 28, 2017 email complaining that Alcober had yelled at him and told him to shut up, Zamora met with Alcober and reiterated the CCMC standards of behavior to treat employees with courtesy and respect. After Dike complained to Zamora about Alcober again being rude to him, Zamora called Alcober and Guerra into her office with Dike to resolve the conflict. On June 19, 2017, Dike again complained to Sewell and Goodwine about Alcober, stating that "humiliating, disrespecting and harassing me before the patients is the norm for her." Sewell and Goodwine met with Dike the following day to discuss their investigation into his complaints about Alcober, among other things.

Dike has failed to cite evidence of any conduct or comments by Alcober that were racially inappropriate or related to his national origin. He has also failed to rebut Defendants' summary judgment evidence that CCMC took prompt remedial action in response to his complaints regarding Alcober.

### iv. Harassment by Filipino Nurses

Dike's May 19, 2017 email to Sewell stated that, after he complained to Zamora about the mistreatment by Alcober described above, Alcober "got other Philippine nurses

on 3west against me, so they keep frustrating me by speaking their foreign language and finding faults on me each time we are working." In June 2017, to address Dike's complaint about employees speaking in a foreign language in his presence, Zamora instructed unit employees that while it was "perfectly okay to speak your language with your co-workers" in private settings, they should avoid doing so when others were around in order to avoid making others uncomfortable. Acknowledgement of Language Policy, D.E. 40-5. Dike has failed to rebut Defendants' summary judgment evidence that CCMC took prompt remedial action in response to his complaints regarding Filipino nurses speaking a foreign language in his presence.

### v.  Comments by Charge Nurse Rivera

Dike's EEOC Charge and Second Amended Complaint alleged that charge nurses Monica Rivera and Angela Guerra repeatedly told him that his African food stinks and would leave the break room and close the door while he was eating. Dike testified during his deposition that Rivera said that a Black nurse named David Mike was "no longer black" and had "upgraded his status" because he married a Filipino. Dike Dep. at 142–44. Dike also testified that he heard Rivera say "at least five times" that "blacks play the race card" and that she preferred to eat Filipino food. *Id.* at 144–45. Dike did not raise these allegations in his many written complaints of discrimination to CCMC management; however, another Black nurse, Brenda Brenyah, complained of such comments in May 2017. Sewell Decl. ¶ 4. Dike testified that "Brenda made a complaint" about Rivera's comments and that he and Brenya "always talk about our case." Dike Dep. at 196, 264.

Goodwine and Sewell investigated Brenyah's complaints by interviewing the individuals involved. Sewell Decl. ¶ 4. Rivera stated that she had made comments about foods (such as microwaved fish) stinking generally, but it was not specific to one type of food or race. *Id.* Mike stated that Rivera had once told him he was not Black anymore because he married a Filipino, but he was not offended and didn't feel the comment was inappropriate because "that was their relationship." *Id.* Sewell counseled Rivera and others to be mindful and that such comments should not be made. *Id.*

Rivera's comments that another employee had "upgraded his race" or that "blacks play the race card" constitute "second-hand harassment," which occurs when the plaintiff does not personally hear the remarks or when the remarks were not directed at the plaintiff. *See Johnson v. TCB Const. Co., Inc.*, 334 F. App'x 666, 670 (5th Cir. 2009) (second-hand harassment "is less objectionable than harassment directed at the plaintiff"). The Fifth Circuit has held that second-hand harassment is insufficient to constitute a hostile work environment. *See Frazier v. Sabine River Auth. La.*, 509 F. App'x 370, 371–72, 374 (5th Cir. 2013). Dike has also failed to rebut Defendants' summary judgment evidence that CCMC took prompt, remedial action in response to both his and Brenyah's complaints.

### vi. Mocking his accent

Dike claims for the first time in response to Defendants' motion for summary judgment that his coworkers harassed him by mocking his accent. Citing only his own deposition testimony, Dike claims that his charge nurses would mimic everything he said each time he worked with them. Dike Dep. at 145–47. Dike says he complained to Zamora once, but the mocking continued. *Id.* at 157–58. Dike did not raise this issue in his EEOC

Charge or Amendments, his Second Amended Complaint, or in his various emails to CCMC management. "A claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).

For the reasons stated above, Dike's Title VII hostile work environment claim is dismissed.

### 4. Dike' Title VII Retaliation Claim

#### a. Legal Standard

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of retaliation under Title VII, a plaintiff has the burden to prove that: (1) he participated in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Hernandez,* 670 F.3d at 657. The causation standard for retaliation is "but for" causation. *Id.* at 660.

#### b. Analysis

There is no dispute that Dike engaged in a protected activity when he complained to CCMC management and the EEOC about alleged acts of racial discrimination, or that he was written up numerous times and ultimately terminated from his employment. However, he has failed to establish a prima facie case of retaliation because he has not raised a genuine issue of material fact that there was a causal connection between his protected activity and any adverse actions.

### i. Write-Ups

Dike testified that, after he complained about discriminatory practices internally, Zamora retaliated against him by writing him up for clocking out late. Dike Dep. at 176-77. Defendants have offered unrefuted evidence that Dike regularly stayed an hour over his shift and was repeatedly counseled by Zamora about clocking out late before he received a verbal warning on January 16, 2017. *See* D.E. 39-1, 39-3, 39-4. The first record of Dike complaining of racial discrimination did not occur until his May 19, 2017 email to Sewell.

Dike further complains that Sewell retaliated against him when he issued a final written warning for conduct and behavior without substantiating Dike's concerns by watching video coverage of the incident between Dike and Ibarra during shift change on August 6, 2017. Dike asked Sewell to pull a video, but Sewell refused, explaining that the cameras do not capture all the nurses' stations and were more for security purposes. Dike Dep. at 213; Sewell Dep at 69.

An employer need not prove that its legitimate, nondiscriminatory reason for its employment actions is accurate; rather, the question is whether the employer believed in good faith that its reason for its decision was valid. *See Swenson v. Schwan's Consumer Brands N. Am., Inc.*, 500 F. App'x 343, 346 (5th Cir. 2012) (citing *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993)). Here, there is no fact issue as to whether Sewell believed in the underlying basis for the final written warning, given that Dike's aggressive and confrontational behavior had been reported by multiple different employees and personally witnessed by Zamora and Sewell over the course of Dike's

employment. Dike also does not dispute that he had to be pulled back from the encounter on August 6. Dike Dep. at 217. Finally, Dike's own testimony that his final written warning was in retaliation for reporting a patient safety issue and complaining that his coworkers were sleeping on the job—not for his complaints related to discrimination on the basis of race/color/national origin—belies his Title VII retaliation claim. *See* Dike Dep. at 202–06.

In sum, Dike has failed to raise a genuine issue of material fact that the write-ups he received were not justified or that there was a causal connection between the writeups and any protected activity.

### ii. Failure to Provide Lunch Breaks

Dike further complains that, after he filed his EEOC Charge, his charge nurses on the bariatric unit retaliated by refusing to give him coverage for authorized breaks, while non-Black CNAs on the unit were given coverage to take breaks. As set forth in Part V.A.2.b.ii, *supra*, Dike has failed to offer any competent summary judgment evidence in support of this claim.

### iii. Termination

Finally, Dike claims that, after he complained to the EEOC, Defendants "undertook a scheme" to wrongfully terminate his employment. As set forth in Part V.A.2.b.i, *supra*, Dike does not rebut Defendants' evidence that he took a 90-minute unauthorized break in the early morning hours of March 1, 2018, or that he was on a final written warning at the time of his unexplained absence. He has also failed to produce any evidence that Rubano— who made the decision to terminate him—knew that he had filed an EEOC charge of discrimination. *See Lara v. Kempthrorne*, 673 F. Supp. 2d 504, 520 (S.D. Tex. 2009)

(quoting *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.")).

For the reasons stated above, Dike's Title VII retaliation claim is dismissed.

## B. 42 U.S.C. § 1981

In addition to his Title VII claims, Dike raises claims against Defendants for "damages in violation of rights guaranteed to Plaintiff under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, §1981a regarding the right to make and enforce contracts and full and equal benefits under the statute . . . on account of race, color, and national origin discrimination, hostile work environment, and retaliation." Sec. Am. Compl., ¶ 2; *see also id.* ¶¶ 65–78.

Like Title VII, § 1981 also prohibits employment discrimination on the basis of race. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459–60 (1975). Specifically, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Claims of race-based discrimination brought under § 1981 are governed by the same framework applied to claims of employment discrimination brought under Title VII. *See Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (citing *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996)). A plaintiff's claims under § 1981 are subject to a four-year statute of limitations under the "catch all" limitations period for

federal claims, 28 U.S.C. § 1658. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–84 (2004); *Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 341 (5th Cir. 2005).

### 1.  Dike's Time-Barred Claims Under § 1981

Dike filed this lawsuit on December 23, 2021; thus, any conduct that occurred before December 23, 2017, is not actionable. Dike conceded during oral argument that his § 1981 claims for hostile work environment and retaliation related to his internal complaints are time barred. Accordingly, those claims are dismissed. The only conduct in the complaint that was alleged to have occurred after December 23, 2017, is: (1) Defendants provided lunch coverage for non-Black CNAs on the bariatric unit but not for Dike and (2) Dike's termination.

### 2.  Dike's § 1981 Discrimination Claim

#### a. Legal Standard

To demonstrate a prima facie case of employment discrimination under § 1981, a plaintiff must show that: (1) he is a member of a racial minority; (2) his employer had an intent to discriminate on the basis of race; and (3) the discrimination concerned "the making and enforcing of a contract." *See Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (1997) (citing *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994)). The standard of proof for Title VII discrimination claims also applies to § 1981 claims. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

#### b. Analysis

As the Fifth Circuit has stated, "It is the rule of this Court that consideration of an alternative remedy brought under § 1981 is necessary only if its violation can be made out

on grounds different from those available under Title VII." *Page v. U.S. Indus., Inc.*, 726 F.2d 1038, 1042 n.2 (5th Cir. 1984). Dike has not alleged facts of intentional racial discrimination distinct from those necessary to allege a Title VII cause of action. Thus, his employment discrimination claim under § 1981 is dismissed for the same reason his racial discrimination claim was dismissed under Title VII. Dike has failed to raise a genuine issue of material fact that he was terminated based on his race, color, or national origin; that he was replaced by someone outside of his protected class; or that similarly situated employees were treated more favorably. *See* Parts V.A.2.b.i–ii, *supra*.

### 3.  Dike's § 1981 Retaliation Claim

#### a. Legal Standard

To present a prima facie case of retaliation under § 1981, a plaintiff must show that: (1) he engaged in an activity protected by statute; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Willis v. Cleco Corp.,* 749 F.3d 314, 317 (5th Cir. 2014).

#### b. Analysis

Dike's retaliation claim under § 1981 is dismissed for the same reason his retaliation claim was dismissed under Title VII. He has failed to raise a genuine issue of material fact that there was a causal connection between his protected activity and any adverse employment actions. *See* Parts V.A.4.b.ii–iii, *supra*.

## VI. Conclusion

For the reasons set forth above, Defendants Columbia and Bay Area's joint Motion for Summary Judgment (D.E. 38) is **GRANTED**, and this action is **DISMISSED**.

**ORDERED** on January 2, 2024.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE